Filed 4/19/16  Asha Vico S.L. v. Wellspring Industry CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ASHA VICO S.L., | B260766 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC557120) |
| v. | |
| WELLSPRING INDUSTRY, INC. et al., | |
| Defendants and Respondents. | |

APPEAL from an order of the Superior Court of Los Angeles County, Debre Katz Weintraub, Judge.  Affirmed.

Robins Kaplan, David Martinez, Jennifer W. Leland and Eliot M. Houman for Plaintiff and Appellant.

Russ, August & Kabat, Jules L. Kabat, Irene Y. Lee and Paul A. Kroeger for Defendants and Respondents.

———————————

## INTRODUCTION

Plaintiff Asha Vico S.L. (Asha Vico) appeals from an order denying its motion for a preliminary injunction against defendants Wellspring Industry, Inc. (Wellspring) and Golden Global Limited (Golden Global) (collectively defendants). Asha Vico contends that the trial court abused its discretion in finding that Asha Vico failed to establish a likelihood of prevailing on the merits. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    THE AGREEMENT TO SELL TUTTI FRUTTI FROZEN YOGURT IN SPAIN

In 2012, Des Mackin and Aisling Forkin, his wife, formed Asha Vico to build the frozen yogurt market in Spain. On November 15, 2012, Asha Vico entered into a "*Tutti Frutti* Product Distribution Agreement" (Agreement) with Golden Global, which granted Asha Vico the right to sell Tutti Frutti (TF) Frozen Yogurt at a store in Barcelona. The parties also entered into two separate agreements to open two additional stores in Barcelona.

At issue in this case is a provision in an addendum to the Agreement for the right of first refusal for master licensing rights to the TF brand throughout Spain. The provision states:

> "The Distributor shall have First Right of Refusal regarding any future exclusive distribution and licensing rights of Tutti Frutti Frozen Yogurt for the entire country of Spain ('Master Licensing Rights'). If proposed, Distributor will then have sixty (60) calendar days to accept . . . by executing a separate Exclusive Product Distribution and Long-Term Mutual Cooperation Agreement ('Exclusive Agreement') with Supplier for the country of Spain and paying the then-proposed Distribution/License Fee (currently set at US$350,000), minus all license fees previously paid for then-existing Tutti Frutti product distribution agreements.
>
> "If Distributor refuses the proposed Exclusive Agreement or fails to accept it within the sixty (60)-day period, Supplier may assign Master

2

Licensing Rights to a separate party, through a separate exclusive agreement with the separate party.

"This First Right of Refusal will no longer be valid if the Distributor's three (3) contracted retail locations do not open for operation at an average of one (1) retail location with continuous operations every six (6) months from the Agreement's Effective Date, equivalent to a total period of eighteen (18) months from the Agreement's Effective Date (the 'Opening Period') or have closed or stopped operating within the Opening Period or thereafter."

The Agreement contains an integration clause and states that it may not be amended or modified except by "written consent of both parties." The Agreement is to be "interpreted according to the laws of the State of California."

## B. ASHA VICO OPENS ITS FIRST STORE IN BARCELONA

On November 26, 2012, Asha Vico secured a location in Barcelona for opening its flagship store. Soon after, Asha Vico claims that it began experiencing problems with defendants. According to Asha Vico, defendants: neglected to provide training on the use of the frozen yogurt machines and the point of sale system; failed to provide assistance with signage or advertising; and supplied it with products that were past their expiration date. Despite these difficulties, Asha Vico opened its store on April 26, 2013.

## C. WELLSPRING BEGINS NEGOTIATIONS FOR MASTER LICENSING RIGHTS

In July 2013, three months after Asha Vico opened its first store, Michael Kim,[1] Wellspring's Legal Administration Manager, tried to start negotiations with Asha Vico for master licensing rights in Spain. In doing so, Wellspring appeared to be acting on behalf of Golden Global. (See Discussion, *post*, at pp. 12-13.) Asha Vico informed Michael that it did not want to discuss master licensing rights without first establishing a

---

[1] There are several individuals with the Kim surname that worked for Wellspring and/or Golden Global: Michael Kim, Jay Kim, and Sophie Kim. For convenience and clarity, we refer to each by his or her first name.

track record at its flagship store.  By November 2013, the flagship store was doing well, and Mackin contacted Wellspring to pursue the master licensing rights.

On January 27, 2014, Michael sent Mackin a draft master licensing agreement as an attachment to an email.  The email stated that the attached "draft has changes from the very basic draft agreement [Michael] sent [Mackin] back in July of last year," and that Mackin's "input [was needed] to finalize everything."  The email concluded by stating: "As you know, our original agreements with you include a first right of refusal, which we are very happy to honor.  However, our timeline is running out and we need to plan out our route for the brand in Spain."

On February 17, 2014, Mackin and his business partner Declan Ryan met with Jay and Sophie, the founders of Wellspring and the TF brand, about Asha Vico's becoming the exclusive distributor of the TF brand in Spain.  During the meeting, Michael cautioned Mackin not to discuss the terms of their anticipated agreement with Tom Strauss, an American investor who was the distributor and licensor of TF in several European countries.  The following day, Jay and Sophie met with Forkin at the Barcelona store and promised to provide assistance to resolve the problems that Asha Vico had been experiencing in operating the store.

**D.     ASHA VICO REJECTS THE PROPOSED FEBRUARY 2014 MASTER AGREEMENT**

On February 20, 2014, Michael sent Mackin "the final revised version of the master agreement for Spain" (hereinafter, the proposed master agreement).  (Italics omitted.)  In the email, Michael noted that "the only changes from the last version [from July 2013] are the distribution fee and sub-licensing fee structure."  (Italics omitted.)  He offered to respond to any questions or concerns about the proposed master agreement and otherwise requested that Mackin confirm that the proposed agreement was acceptable.

On March 20, 2014, Asha Vico rejected the proposed master agreement.  In its email, Asha Vico stated in full:

"Thank you for providing us with the attached agreement, which I have reviewed and discussed with our Spanish legal advisors. Unfortunately the current agreement will require too many amendments,

4

especially with regards to the Master Franchise Agreement which has not been adequately covered.  I am advised this will require a separate legal agreement along with the Exclusive Product Distribution Agreement.  We believe this will be too time consuming and costly for us to progress at this stage.

"We would however like to review this again at a later stage and look forward to maintaining a strong working relationship with you in regards to our current store.  We hope with your support we can make the store in Barcelona a great success and a perfect template for further Spanish stores."

On March 28, 2014, Michael responded to Asha Vico's March 20th email.  At the end of the email, he advised Asha Vico that Wellspring would consider offering the master distribution and licensing rights to others:

"Thank you for your email . . . .  As I noted to [Mackin], this is the same basic draft we use for all of our potential master distributors, working together to revise as necessary.

"Although I first sent this draft to [Mackin] eight months ago on July 24, 2013, this is the first feedback I've received from Asha Vico's end.  I do not know if Asha Vico gave any consideration to the draft during that eight-month period, but we are sorry nonetheless that you feel the [master] [a]greement would require too many amendments and it is not worth your while to pursue.  I'm confident that an agreeable draft could have been finalized within that period.

"In accordance to our existing Tutti Frutti Product Distribution Agreements as amended, we will give consideration to other inquiries for the master distribution and licensing rights of the Tutti Frutti Frozen Yogurt brand.  We will keep you apprised of any updates for the territory."  (Italics omitted.)

**E.** **SUBSEQUENT DISCUSSIONS ABOUT A MASTER AGREEMENT**

At the end of March 2014, Mackin attended a franchise trade show in Paris, where Strauss had a booth for TF Europe. The following day, Mackin saw Strauss talking to Jay and Sophie. Mackin then spoke to Jay and Sophie, who expressed their concerns about Asha Vico's commitment to becoming the master distributor in Spain. According to Mackin, he assured them that Asha Vico was still committed, and Jay told him that Wellspring still wanted Asha Vico to be the master distributor in Spain.

On March 31, 2014, Mackin summarized the parties' recent dealings in an email to Michael and stated that he would forward his proposed amendments to the draft master agreement in an effort to "conclude this deal." The next day, Michael responded by email in which he suggested that Asha Vico had not demonstrated the desire and ability to be a master distributor in Spain. He explained that Asha Vico had flatly rejected the master agreement proposal in February without offering any counter-proposal, had questioned the profitability of the TF brand, and had only opened one store. Michael also noted that Wellspring had accepted Asha Vico's rejection of the proposed master agreement, and that Wellspring was "fine" with Asha Vico's decision. After Michael sent this email, the parties nonetheless continued to discuss a possible agreement.

On April 2, 2014, Asha Vico emailed Michael approximately three pages of proposed changes, stating: "Please find below our comments on the [master agreement]. We look forward to progressing these items with you and getting the Master Franchise to a close as soon as possible." The parties then attempted to work out an agreement over the next several months.[2]

On June 12, 2014, Michael responded to Asha Vico's proposed amendments, providing a paragraph-by-paragraph response, to which Asha Vico replied on June 25,

---

[2] On May 22, 2104, Michael advised Asha Vico that Wellspring was interested in "mov[ing] forward," but that he had not yet had a chance to respond to Asha Vico's proposed changes to the master agreement. He indicated that he expected to provide comments soon.

2014.  Michael did not respond in July, except to say that Wellspring was still working on Asha Vico's latest proposed revisions to the master agreement.

In the meantime, while Wellspring and Asha Vico were negotiating a master agreement, Asha Vico was separately discussing a potential business deal with Strauss. Mackin met with Strauss in Dublin, Ireland on June 16, 2014, and Strauss visited the Barcelona store on July 12.  Mackin claims that he learned at the Dublin meeting that Strauss paid $1 for his distribution rights in Europe because Wellspring profited from the sale of its products to its distributors.  At the Barcelona meeting, Strauss "was very critical of [Asha Vico's] store and of [Asha Vico's] planned roll out plan as master distributor."  According to Mackin, Strauss stated that he was not interested in acquiring rights in Spain and would partner with Asha Vico only if he was the majority shareholder who had control over all major decisions.

On August 5, 2014, Wellspring terminated the negotiations.  Michael wrote to Mackin stating that Asha Vico had only opened one store in Barcelona, which was "predominantly a cafe" that had only a small section dedicated to the TF brand, and that Asha Vico previously had rejected the master agreement that was originally proposed in July 2013.  Michael then stated:  "In the meantime, I introduced you to Mr. Tom Strauss, our master distributor for a number of other European countries, so you may converse and cooperate for the European market.  I've come to learn that you proposed to [Strauss] to purchase your existing TF store in Barcelona and TF rights for Spain (which you do not have at this time).  Your intentions with this proposal are extremely different from what you've discussed with us, which was your dedication to be involved with the brand and expand it through your own efforts."  As a result, Wellspring "will no longer consider any offering of master distributor rights for TF Spain to [Asha Vico]."

Shortly after receiving Michael's email, Asha Vico responded that Wellspring's views were contrary to the parties' prior course of dealings.  Asha Vico closed by stating that it would refer this matter to its "U.S. [and] European lawyers" and asked that Wellspring reconsider its "extreme decision."

**F. ASHA VICO FILES THIS LAWSUIT AND SEEKS PRELIMINARY RELIEF**

On September 12, 2014, Asha Vico filed its original complaint in this action along with an ex parte application for a temporary restraining order. On September 15, 2014, Judge (now Justice) Luis A. Lavin denied the application, explaining: "The application is premised on a distribution agreement with defendant Golden Global Limited that contains a right of first refusal in one of the addendums. Here, [Asha Vico] rejects the proposed master distribution agreement on March 20, 2014. Thus, the first right of refusal expired sixty days later. [Michael's] May 22, 2014, 'move forward' e-mail did not reinstate the agreement or the first refusal right. Notably, Paragraph 13(a) of the distribution agreement provides that it may only be amended in writing. This was not done. [¶] In addition, [Asha Vico] has not complied with other conditions to invoke the first refusal right. In sum, [Asha Vico] has not shown that it is likely to prevail on the merits."

On October 7, 2014, a day after Golden Global terminated the distribution agreements for the three Barcelona stores,[3] Asha Vico filed its first amended complaint for fraudulent inducement, promissory estoppel, breach of contract, and breach of the implied covenant of good faith and fair dealing. Days later, Asha Vico filed a motion for preliminary injunction.

On November 19, 2014, Judge Debre Weintraub denied the preliminary injunction motion. She concluded: "[Asha Vico] failed to accept . . . and also affirmatively refused the exclusive agreement. As such, [Asha Vico] relinquished the right of first refusal under the contract. For purposes of this motion, [Asha Vico] has not demonstrated the likelihood of prevailing on the merits. Because [Asha Vico has] not satisfied . . . its

---

[3] Golden Global notified Asha Vico that it was terminating the agreements because of Asha Vico's several breaches, including Asha Vico's interference with Golden Global's prospective economic advantage by attempting to sell the master licensing rights for Spain to a third party, selling unauthorized products at its Barcelona store, and failing to open two additional stores in Barcelona.

burden o[n] the first prong, the court need not and does not address the balancing of the harms."

## **DISCUSSION**

### A. STANDARD OF REVIEW

The decision whether to grant a preliminary injunction depends on the balancing of two factors: the moving party's likelihood of eventual success on the merits; and the relative harm to each party by the decision to grant or deny provisional relief. (*Ryland Mews Homeowners Assn. v. Munoz* (2015) 234 Cal.App.4th 705, 711-712.) In deciding whether to grant relief, the trial court serves as a fact finder and is charged with resolving all factual disputes, even those requiring credibility determinations. (*Ibid.*) On appeal, we defer to those findings, whether express or implied, so long as they are supported by substantial evidence, and we draw all reasonable inferences in favor of the trial court's order. (*Ibid.*) The trial court's ultimate decision to grant or deny a preliminary injunction is reviewed for abuse of discretion, which we do not lightly disturb. (*Ibid.*)

### B. LIKELIHOOD OF SUCCESS ON THE MERITS

1. *The Trial Court's Implied Finding of Good Faith Is Supported by Substantial Evidence.*

In *Nelson v. Reisner* (1958) 51 Cal.2d 161, 169 the court held that a bad-faith offer cannot defeat a party's contractual right of first refusal. (*Ibid.* [holding that the defendant did not waive his right of first refusal by rejecting an unreasonable offer made in bad faith].) Relying on that holding, Asha Vico argues that it demonstrated a likelihood of success on the merits by proving that the proposed master agreement was offered in bad faith. This argument, however, overlooks the documented negotiating history between the parties, which strongly supports the trial court's implied finding that Wellspring had proposed the agreement in good faith on February 20, 2014, and that Asha Vico declined to accept the proposal as required within 60 days.

From the outset, Wellspring demonstrated a seriousness of purpose in pursuing a master agreement, commencing discussions and forwarding a draft agreement in July 2013, shortly after Asha Vico opened its flagship store in Barcelona. Asha Vico declined

9

Wellspring's initial proposal, stating that it wanted to test the market further before making such a commitment. It was not until the end of 2013 that Asha Vico appeared willing to discuss a master agreement. In January 2014, Wellspring then sent a revised draft of the master agreement with a message that it was still willing to honor the right of first refusal, but that time was running out because it "need[ed] to plan out [its] route for the brand in Spain."

On February 20, 2104, Wellspring sent Asha Vico a revised version of the master agreement. One month later, Asha Vico rejected the proposed agreement, claiming it would "require too many amendments" that would be "too time consuming and costly" to pursue. Significantly, Asha Vico never suggested that it was rejecting the proposal because Wellspring was operating in bad faith. Instead, Asha Vico sought to keep the door open to future negotiations, stating: "We would however like to review this again at a later stage . . . ." It thus appears that Asha Vico was not ready to fully commit to the Spanish market—or at least the evidence permitted the trial court to draw this reasonable inference.

The subsequent events support that inference. When Wellspring advised Asha Vico that it would consider offering the master licensing rights to others in light of the rejection, Asha Vico suddenly changed its position about the time, cost, and difficulty of completing the agreement, indicating that it would not be at all time-consuming, costly, or difficult. Mackin wrote: "We need to submit our few amendments and have the final agreement finalized and signed this week—[I] and Jay agreed that any agreement always has amendments and we both have reviewed contracts and never signed an agreement straight away without amendments being made. This is quite normal." Then, two days later, Asha Vico managed to send three pages of proposed modifications. And even after Wellspring rejected most of the proposed changes, Mackin "remained confident that the parties would agree on [the] written terms."

Against this background, the trial court reasonably rejected Asha Vico's claim that Wellspring was operating in bad faith. As evidence of bad faith, Asha Vico first points to the terms in the February 20, 2014 proposed master agreement, arguing that the draft

10

agreement "imposed virtually no obligations on Wellspring and placed intolerable financial risk on [Asha Vico]." Asha Vico claims that the terms, on their face, were so "appalling" as to "shock the conscience." But if the terms of the draft agreement were as Asha Vico now describes them, then presumably Mackin would not have characterized the negotiation process as "quite normal" and would not have been so confident about reaching an agreement.[4]

As further evidence of bad faith, Asha Vico next relies on Strauss's statement to Mackin in June 2014 that Strauss "intended to roll out Tutti Frutti throughout Europe," and that "he had paid only one dollar ($1.00) for all of his distribution rights in Europe." This vague hearsay, however, does not indicate that Strauss was offered the distribution rights to Spain for $1. In fact, Mackin stated in his declaration in support of his preliminary injunction motion that "Strauss claimed [in July 2014] to have no interest in acquiring rights in Spain." Thus, Asha Vico produced no evidence that Wellspring had offered more favorable terms to Strauss while negotiating with Asha Vico. That Wellspring may have given better terms to Strauss in markets other than Spain is of limited relevance to whether it was operating in good faith in negotiating with Asha Vico for the rights in Spain. (See *San Diego Watercrafts, Inc. v. Wells Fargo Bank* (2002) 102 Cal.App.4th 308, 317 [noting that the tenant's right of first refusal precluded the landlord from offering to sell *the same property* on better terms to a third party].)

In short, the trial court was presented with substantial evidence of the negotiating history between the parties. In weighing the evidence, the trial court reasonably could place greater weight on the negotiation history, as contemporaneously documented, than on Asha Vico's interpretation of that evidence, as viewed through the lens of litigation.

---

[4] In arguing that the proposed master agreement was offered in bad faith, Asha Vico relies heavily on "Wellspring's refusal to warranty [its] own products for human consumption while requiring [Asha Vico] to indemnify [it] if anyone became ill . . . ." During the negotiations, however, Wellspring did not appear to disclaim this warranty. Rather, Wellspring's position was that "[t]he products themselves automatically come with a warranty of fitness for use."

11

Though Asha Vico claims that it "is not asking [us] to reweigh conflicting evidence," that is precisely what it is encouraging us to do. We find that the trial court acted well within the bounds of reason in rejecting the claim that Wellspring proposed the draft master agreement in bad faith and in thus denying the request for a preliminary injunction.[5]

      2.      *Asha Vico's Remaining Arguments Lack Merit.*

Asha Vico's remaining arguments do not lead to a different conclusion.

First, Asha Vico claims that defendants' objection to discovery, lodged on the ground that the case was subject to arbitration, "triggered adverse inferences under Evidence Code sections 412 and 413 that the evidence would have been unfavorable to [defendants] if produced." But Asha Vico cites no authority that would allow an adverse inference against a party for exercising its right to challenge discovery. (See, e.g., Code Civ. Proc., §§ 2023.030, 2025.420, 2030.090.)

Second, Asha Vico argues that it did not reject Golden Global's offer for a master agreement because the offer was extended by Wellspring. However, substantial evidence supports the trial court's implied finding that Wellspring was acting on behalf of Golden Global in negotiating the master agreement. As alleged in the first amended complaint, Golden Global and Wellspring "share the same Fullerton office space and share overlapping officers and/or directors." Moreover, throughout the negotiations, Mackin never expressed concern that Michael—whose email signature identified him as a

---

5      Because of this conclusion, we do not reach the question whether defendants waived their right to claim that Asha Vico had breached the Agreement by failing to open all three Barcelona stores, selling alcohol at the one store it opened, and failing to pay all money due under the Agreement. Nor do we address the question whether the balance of hardships favored Asha Vico. Asha Vico has not argued that it is entitled to preliminary relief without having to show a likelihood of success on the merits based on a "sliding scale" approach. (*Cinquegrani v. Department of Motor Vehicles* (2008) 163 Cal.App.4th 741, 750 [discussing sliding scale].) We therefore do not consider this argument. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

Wellspring official—was unauthorized to negotiate a master agreement for Golden Global.

## DISPOSITION

The order is affirmed. Defendants are to recover their costs on appeal.


BLUMENFELD, J.[*]


We concur:


ZELON, Acting P. J.


SEGAL, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.